UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BEI SENSORS & SYSTEMS COMPANY, INC., | Case No:  C 09-5819 SBA |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION; AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION** |
| vs. | |
| GREAT AMERICAN INSURANCE COMPANY, | |
| Defendant. | Dkts. 62, 65 |

Plaintiff brings this insurance breach of contract action against Defendant.  Federal jurisdiction is premised on diversity of the parties under 28 U.S.C. § 1332.  The parties are presently before the Court on: (1) Defendant's Motion for Summary Adjudication, whereby Defendant seeks partial summary judgment in its favor as to Plaintiff's claim for losses sustained before Plaintiff became a subsidiary of the named insured Schneider Electric Holdings, Inc.; and (2) Plaintiff's Motion for Summary Adjudication of Certain Defenses, whereby Plaintiff seeks partial summary judgment as to Defendant's Fifth, Sixth, Seventh, Ninth, and Tenth Affirmative Defenses.  Dkts. 62, 65.  Having read and considered the papers filed in connection with these matters and being fully informed, the Court hereby DENIES Defendant's motion and GRANTS IN PART and DENIES IN PART Plaintiff's motion for the reasons set forth below.  The Court, in its discretion, finds these matters suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b).

# I.   FACTUAL BACKGROUND

## A.   OWNERSHIP OF PLAINTIFF

This matter involves the theft of gold by employees in Plaintiff's manufacturing divisions, Systron Donner Inertial and Systron Donner Automotive (collectively referred to

herein as "Systron Donner").  See Joint Statement of Undisputed Facts ("SUF") ¶ 1, Dkt. 64.
In 2005, Schneider Electric Holdings, Inc. ("SEHI") purchased Plaintiff's parent company, BEI
Technologies, Inc.  Id. ¶ 3.  On October 2, 2005, the sale was completed and Plaintiff became
the indirect subsidiary of SEHI, through SEHI's ownership of BEI Technologies, Inc.  Id.  As
of that date, Plaintiff was a subsidiary of BEI Technologies, Inc., which in turn was a
subsidiary of SEHI.  Id.

> **B.    THE POLICY**

Defendant issued Crime Protection Policy, No. SAA 517-77-45-03 (the "Policy"),
identifying "Schneider Electric Holdings, Inc." (previously defined herein as "SEHI") as the
Named Insured.  Id. ¶ 5.  The Policy was effective from May 1, 2007 to May 1, 2008.  Id.
Though Plaintiff is not directly identified as an insured under the Policy, it is insured by virtue
of the fact it became an indirect subsidiary of SEHI on October 2, 2005.  That is, pursuant to
the "Joint Insured" endorsement of the Policy, the following are added as Named Insureds:

> SCHNEIDER ELECTRIC HOLDINGS, INC. AND SUBSIDIARIES AND
> CROUZET CORP. / CROUZET MEXICANA S.A AND NUM
> CORPORATION AND JEUMONT-SCHNEIDER INDUSTRIE AND TAC
> AMERICAS, INC. AND ABACUS ENGINEERED SYSTEMS, INC.
>
> ANY ENTITY WHICH IS SUBJECT TO CONTROL BY THE INSURED BY
> REASON OF (1) OWNERSHIP INTEREST IN SUCH ENTITY IN EXCESS
> OF 50% OR (2) OPERATION OF SUCH ENTITY THROUGH VOTING
> CONTROL OR BY WRITTEN CONTRACT …

Id. ¶ 7.

The Policy states in pertinent part:

> **CRIME PROTECTION POLICY**
>
> Throughout this Policy the words "you" and "your" refer to the insured(s) shown
> in the Declarations.
>
> …
>
> **A.    CONSIDERATION CLAUSE**
>
> In return for the payment of the premium, and subject to the Declarations,
> Insuring Agreements, Definitions, Exclusions, Conditions and other terms of this
> Policy, <u>we will pay you for loss that you sustain resulting directly from acts
> committed or events occurring at any time and discovered by you during the</u>

- 2 -

<u>Policy Period</u> shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss …

<u>Id</u>. ¶ 8 (underline added).

As amended by Endorsement No. 18, the Policy also provides as follows:

We will pay for loss of, and loss from damage to, money, securities and other property resulting directly from "Employee Dishonesty":

A.  With the exception of loss resulting from "trading:"

> "Employee Dishonesty" means only "theft" by an "employee," whether identified or not, acting alone or in collusion with other persons, except you or a partner.

> ….

<u>Id</u>. ¶ 9.  The Limit of Insurance for "Employee Dishonesty" is $20 million dollars, with a $250,000 per occurrence deductible.  <u>Id</u>. ¶ 6.

Insuring Agreement No. 1 contains two definitions that are pertinent here – "theft" and "employee."  Endorsement No. 18 defines "theft" as the "unlawful taking of 'money,' 'securities,' or 'property other than money and securities' to the deprivation of the Insured."  <u>Id</u>. ¶ 10.  The Policy defines "employee" as follows:

> 4.     **Employee** means:

> a.  Any natural person:

> > (1) while in your service or for 30 days after termination of service; and

> > (2) whom you compensate directly by salary, wages or commissions; and

> > (3) whom you have the right to direct and control while performing services for you.

<u>Id</u>. ¶ 11 (emphasis in original).

The following Policy provisions are also pertinent to the instant motions (emphasis in original):

**[E. Conditions] 6. Discovery of Loss**[:] Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a

loss covered by the insurance has been or will be incurred, even though the exact amount or details may not then be known.  (SUF Ex. A at 13, ¶ 6.);

**[E. Conditions] 7. Duties in the Event of Loss**[:] [as modified by Endorsement No. 5]

AFTER ANY MEMBER OF THE RISK MANAGEMENT DEPARTMENT, AND/OR LEGAL DEPARTMENT, AND OR GENERAL COUNSEL AND/OR INTERNAL AUDIT DEPARTMENT AND/OR HUMAN RESOURCE DEPARTMENT DISCOVERS A LOSS OR A SITUATION THAT MAY RESULT IN LOSS FROM DAMAGE TO, COVERED PROPERTY THE RISK MANAGEMENT DEPARTMENT, AND/OR LEGAL DEPARTMENT, AND/OR GENERAL COUNSEL AND/OR INTERNAL AUDIT DEPARTMENT AND/OR HUMAN RESOURCE DEPARTMENT YOU MUST:

    a.    notify us as soon as possible;

    b.    submit to examination under oath at our request and give us a signed statement of your answers;

    c.    give us a detailed, sworn proof of loss within 120 days;

    d.    cooperate with us in the investigation and settlement of any claim. (Id. at  GA 3982 and 4004.)

….

**[E. Conditions] 17. Ownership of Property, Interests Covered**[:] The property covered under this insurance is limited to property: (a) that you own or hold; or (b) for which you are legally liable. However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. (Id. at 15, 16.)

….

**Endorsement No. 15: Applicable to Specific Insuring Agreements, 1. Cancellation as to Any Employee**[:] This insurance is canceled as to any **employee**: Loss caused by an employee if the insured possesses knowledge of any act or acts of fraud or dishonesty committed by such employee: (1) In the service of the Insured or otherwise during the terms of employment by the Insured, or (2) prior to the employment by the Insured provided that such conduct involved loss of money, securities or other property valued at $25,000 or more. (Id. at Endorsement 15.)

**C.**    **USE OF GOLD IN PLAINTIFF'S MANUFACTURING PROCESS**

Systron Donner manufactured sensors used in inertial sensing systems, such as automotive stability control, at its facility in Concord, California.  SUF ¶¶ 2-3; Knowles Decl.

¶ 3, Dkt. 68.  The sensors were coated with a uniform layer of gold.  SUF ¶ 12; Knowles Decl.

¶ 6.  The manufacturing process applied gold by heating and evaporating gold in a vacuum

evaporation chamber, called an evaporator, to produce a uniform metallic coating.  Knowles

Decl. ¶ 8.  Because the parts being coated comprised a small percentage of the total surface

area inside of the chambers, the vast majority of the evaporated gold was deposited on the

tooling and inside walls of the chamber.  Id.  Systron Donner employees scraped the gold

deposited on the tooling and inside the chamber after it accumulated sufficiently.  Id.  Scraped

gold was sent to refiners (also known as reclaimers), who melted and purified the gold

recovered from the evaporators and tooling.  Id. ¶ 9.  At Systron Donner, gold was received by

the shipping department, logged into an "ERP system" (presumably referring to an "Enterprise

Resource Planning" system) and stored inside a  purchasing safe.  Id. ¶ 7.  There was also a

paper log for the purchasing safe.  Id.

### D.   CARLOS CORONADO

One issue presented by Plaintiff's motion is the application, if any, that Endorsement

No. 15 of the Policy may have to losses caused by Carlos Coronado, a Systron Donner

employee responsible for operating the evaporators.  Endorsement No. 15 provides that

coverage is cancelled as to an employee if Plaintiff "possesses knowledge of any act or acts of

fraud or dishonesty" committed by such employee.  SUF Ex. A, Endorsement No. 15.

Defendant asserts that Plaintiff had knowledge before 2008 sufficient to terminate

coverage as to Coronado.  Specifically, in or around 2003, Coronado had a meeting with two

supervisors regarding inconsistencies between evaporator logs and logs from the drawers

where gold was stored during the manufacturing process.  Gladding Decl. ¶¶ 7-8, Dkt. 67;

Hartmann Decl. Ex. 4, Almazan Dep. Tr. 184:15-185:3, Dkt. 66.  Both supervisors testified

that, after investigating the matter, they were unable to reach any conclusions whether

Coronado had stolen gold.  Gladding Decl. ¶ 9; Hartmann Decl. Ex. 4, Almazan Dep. Tr.

184:15-185:3.  Coronado's immediate supervisor, Deborah Reeves Gladding, testified under

oath as follows:

A:      My concern is that [Carlos Coronado] was sloppy on his logs and not paying proper attention to detail. And he had documented two to three issues from the gold drawer to the machine that didn't match. In other words, there was no run performed.

. . . .

Q:      And did you confront him about it, or did you address your concerns with someone else?

A:      I talked to my partner supervisor, who at the time was Dan Almazan, about my concern that there were there was something in the logs that didn't match and didn't make sense. So I asked if he would stay with me while I asked Carlos what happened.

Q:      And did he do that?

A:      Yes he did.

Q:      And describe for me that conversation

. . . .

A:      I asked Carlos we asked Carlos into the office, and I explained to him that upon an audit of his process area logs we found some discrepancies we would like him to explain so we could understand why there were a couple runs issued to a machine where a run was not performed. He looked at the logs, and he said I must have made a mistake. I said I wanted him to think again about what could have happened, where he took the gold and went to this machine, what could have happened to it.

Q:      And what did he say?

A:      He said nothing. He didn't respond.

….

Q:      Did you have any suspicion at all that he wasn't telling the truth at all?

A:      I wasn't happy with his lack of explanation.  I didn't have – I wasn't happy with his lack of explanation.  I don't know if he was lying to me.  I couldn't tell if he stole it.  But he couldn't answer why his logs were discrepant and that bothered me.

….

Q:      And after that conversation took place, did you have any other or later concerns about Carlos?

A:      Given that we were so busy, and given that I was not comfortable with his reaction. So when I was a supervisor, when I was not confident in an operator's ability to execute the job in whatever fashion, I would move them out of the process area. It could be any other process area I felt they weren't taking seriously and providing the amount of focus required. So I moved him. Instead of trying to see if, in fact, he was stealing gold or if he's just sloppy with his process. I did not want to take that risk. I didn't have the background. I didn't have the time. I felt he would be better utilized elsewhere. That would solve the problem.

Hartmann Decl. Ex. 5, Gladding Exam. Tr. 19:14-24:17.

Gladding further explains in her declaration: "[a]fter investigating the matter, I was unable to reach any conclusions whether or not Mr. Coronado had simply failed to follow procedures, or whether he had done something improper, such as stealing the gold."  Gladding Decl. ¶ 9.  She further states: "[b]ecause I was not comfortable with Mr. Coronado's lack of explanation, but did not have the time or the background to determine whether he was stealing gold or was sloppy with his process, I felt Mr. Coronado would be better utilized elsewhere and recommended that he be transferred out of the first metal evaporator process."  Id. ¶ 10.  She further explains: "I did not report the incident, or my inability to reach any conclusions, to the human resources department or any of my supervisors."  Id. ¶ 11.

Coronado's other supervisor, Dan Almazan, testified that, at the time, he had not formed the conclusion that Coronado had taken gold.  Hartmann Decl. Ex. 4, Almazan Dep. Tr. 139:17-23.  Gladding offered Coronado a position elsewhere in the plant, took no further action against him, and subsequently gave Coronado positive performance reviews.  Hartmann Decl. Ex. 6, Coronado Dep. Tr. 93:25-98:5.

With respect to Coronado, he testified that he met with Gladding about the discrepancies in his gold logs, but he told her he did not know anything about the missing gold. Hartmann Decl. Ex. 6, Coronado Dep. Tr. 93:25-98:5.  Coronado also admitted that he had lied to Gladding, as he had, in fact, stolen gold pellets.  Id. 95:13-20.  Coronado later plead guilty to federal charges associated with the theft of gold from Systron Donner.  Valeriano Decl. Ex. 1 at 8 & Ex. 5 at 71, Dkt. 76.

**E.     INCIDENTS THAT PLAINTIFF ASSERTS GAVE IT KNOWLEDGE OF THE THEFT**

In contrast, Plaintiff posits that it did not have knowledge of any employee theft prior to 2008.  Specifically, in July 2007, a Systron Donner engineering manager, Stuart Knowles, was assigned to determine how to reduce the cost of so-called consumables, including gold, used in the manufacturing process.  Knowles Decl. ¶ 11.  He conducted an analysis of all gold used and consumed in the manufacturing process, as well as all gold recovered and shipped to refiners.  Id. at ¶ 12.  In November 2007, Knowles concluded that gold appeared to be missing, and that the losses extended back for a number of years.  Id. at ¶ 13.  He rechecked his calculations for several weeks, and eventually concluded that gold was, in fact, missing.  Id.  He initially suspected that the reclaiming companies had somehow been cheating Systron Donner in connection with the reclamation process.  Id. at ¶ 14.

However, in January 2008, Knowles observed an employee named Jerry Kahue on security cameras engaging in suspicious activity in connection with an evaporator.  Id. at ¶ 15.  The Concord Police Department arrested Kahue, who confessed to stealing gold and agreed to cooperate.  Id. ¶ 16.  Ultimately police identified at least twelve current and former employees who had stolen gold.  Id.  Plaintiff immediately terminated employees when it discovered that they were involved with or had knowledge of the thefts.  Id. at ¶ 17.  Although Knowles and local management in Concord, California discovered the first employee thefts in January 2008, the loss was reported internally to SEHI's risk management department on May 21, 2008 by Lynn Lefebvre.  Hartmann Decl. Ex. 1, Lefebvre Dep. Tr. 36:7-18 & Ex. 82.  SEHI's insurance broker filed a notice of the claim with Defendant on May 23, 2008.  Answer to First Amended Complaint ("FAC") ¶ 14, Dkt. 51.  Plaintiff calculated the amount of the gold theft to be in excess of $20 million dollars.  FAC ¶ 16, Dkt. 47.

**F.     THE INSTANT ACTION**

Plaintiff filed its FAC on September 15, 2010, asserting a breach of contract claim against Defendant.  Plaintiff contends that the losses it incurred as a result of its employees' theft of gold from February 2000 to May 2008 are covered under the Policy, and that

1    Defendant breached the Policy by failing to pay the benefits owed under the Policy for those

2    losses.  FAC ¶¶ 24-27.

3         The parties are presently before the Court on cross-motions for partial summary

4    judgment.  Defendant seeks partial summary judgment in its favor as to Plaintiff's claim for

5    losses sustained before October 2, 2005, i.e., before Plaintiff became a subsidiary of SEHI.

6    Plaintiff seeks partial summary judgment as to Defendant's Fifth, Sixth, Seventh, Ninth, and

7    Tenth Affirmative Defenses, which are as follows:

8         • Fifth Affirmative Defense:[1] As a separate and fifth affirmative defense to
            the First Amended Complaint, and to the purported causes of action set
9           forth therein, Defendant alleges that the Policy was cancelled and/or non-
            renewed effective immediately as of the time of notice of the potential
10          claim alleged in the First Amended Complaint and that any potential loss
            was covered by another insurance carrier as of such time.
11

12        • Sixth Affirmative Defense: As a separate and sixth affirmative defense to
            the First Amended Complaint, and to the purported causes of action set
13          forth therein, Defendant alleges that, as one of the Conditions of the
            Policy, pursuant to Section (E) (6) and (7), Plaintiff was obligated to, but
14          failed to, give timely notice of discovery of a loss and Defendant has been
            prejudiced.
15

16        • Seventh Affirmative Defense: As a separate and seventh affirmative
            defense to the First Amended Complaint, and to the purported causes of
17          action set forth therein, Defendant alleges that the pre-acquisition
            (alleged) thefts were not a loss to the Insured but to the prior owner.
18          Thus, the pre-acquisition (alleged) thefts were not a loss to the insured
            and not committed by their employees.
19

20        • Ninth Affirmative Defense: As a separate and seventh affirmative defense
            to the First Amended Complaint, and to the purported causes of action set
21          forth therein, Defendant alleges that Plaintiff failed to comply with the
            Cancellation as to any Employee Condition (E)(1), as set forth at page 18
22          of the Policy and endorsement No. 15, may apply such that the Policy
            was canceled upon notice of the alleged loss.
23

24        • Tenth Affirmative Defense: As a separate and tenth affirmative defense to
            the First Amended Complaint, and to the purported causes of action set
25

26    _____
          [1] In response to Plaintiff's motion for summary judgment as to its Fifth Affirmative
27    Defense, Defendant states that it "concedes the inapplicability of its Fifth Affirmative
      Defense," as this defense "creates only a right of action as to [Plaintiff's] other insurer."  Def.'s
28    Opp. at 5, Dkt. 75.  Therefore, Plaintiff's motion for summary judgment as to Defendant's
      Fifth Affirmative Defense is GRANTED as unopposed.

forth therein, Defendant alleges that Plaintiff failed to comply with
Condition (E)(17) as to the ownership of the claimed property.

<u>See</u> Answer to FAC.

## II.      **LEGAL STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); <u>Celotex</u>, 477 U.S. at 324; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"  <u>Ricci v. DeStefano</u>, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party."  <u>Id.</u> at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  <u>Id.</u>  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> at 249-50 (internal citations omitted).

The proper construction of an insurance policy is a question of law.  <u>Wausau Underwriters Ins. Co. v. Unigard Sec. Ins. Co.</u>, 68 Cal.App.4th 1030 (1998).  Under California law, the first step in the resolution of the dispute between the parties regarding the Policy is the

determination of whether the terms at issue here are clear and unambiguous.  <u>Kilroy Industries</u> <u>v. United Pacific Ins. Co</u>., 608 F.Supp. 847, 852 (C.D. Cal. 1985).  "If, from the language employed, the Court can determine the plain meaning of the Policy, then the Court must hold the parties to their contract."  <u>Id</u>.  On the other hand, if the Court finds that the language in the Policy is ambiguous, then "the meaning and construction most favorable to the insured must be applied."  <u>Id</u>.

### III.     <u>ANALYSIS - DEFENDANT'S MOTION</u>

The parties do not dispute that Plaintiff became SEHI's indirect subsidiary on October 2, 2005.  The parties also do not dispute that, as an indirect subsidiary of SEHI, Plaintiff falls under the "Joint Insured" endorsement of the Policy, and that the Policy became effective on May 1, 2007.  The parties, however, do dispute whether the Policy language precludes Plaintiff's claim for losses it incurred prior to October 2, 2005, when it became SEHI's indirect subsidiary.

According to Defendant, Plaintiff can only recover for loss it sustained after it became an indirect subsidiary of SEHI.  In support of that argument, Defendant relies on the language of Insuring Agreement No. 1, which provides coverage for loss "you sustain" resulting directly from dishonest acts committed by an "employee" in "your service."   Defendant notes that the Policy defines the terms "you" and "your" to mean the insured shown in the Declarations.  Plaintiff is not named on the Declarations.  Also, Plaintiff is not specifically identified in the Joint Insured endorsement, unlike the SEHI.  Rather, Plaintiff is a named insured only because it falls within the scope of "Schneider Electric Holdings, Inc. and subsidiaries" on the Joint Insured endorsement.  Therefore, according to Defendant, prior to October 2, 2005, Plaintiff did not fall within the Policy's meaning of "you" and "your" because it was not SEHI's subsidiary (directly or indirectly) and not within the meaning of "Schneider Electric Holdings, Inc. and subsidiaries."  In other words, prior to October 2, 2005, an entity that was not SEHI's subsidiary experienced gold theft.  Accordingly, to follow Defendant's logic, any loss that Plaintiff sustained before it became SEHI's subsidiary is not covered by the Policy.

1    However, Defendant's interpretation of the Policy to exclude losses prior to SEHI's

2    acquisition of Plaintiff is inconsistent with the plain and unambiguous language of the Policy.

3    See AIU Ins. Co. v. Superior Court, 51 Cal.3d 807, 814 (1990) ("we construe policy language

4    according to the mutual intentions of the parties and its plain and ordinary meaning, resolving

5    ambiguities in favor of coverage").  Specifically, the Policy expressly covers losses "that you

6    sustain resulting directly from acts committed or events occurring at any time and discovered

7    by you during the Policy Period shown in the Declarations or during the period of time

8    provided in the Extended Period to Discover Loss …." Id. ¶ 8 (emphasis added).  At the time

9    the Policy became effective, in 2007, Plaintiff was an indirect subsidiary of SEHI and thus fell

10   within the definition of "you" and "your" under the Policy as an insured.  Plaintiff discovered,

11   during the Policy period, that it had incurred losses as the result of acts committed from 2000

12   to 2008.  Contrary to Defendant's assertions, the Policy does not require that Plaintiff incur the

13   losses while it is a named insured; rather, it only requires that the losses be discovered while it

14   is a named insured.  As noted by Plaintiff, if Defendant had intended to exclude losses that

15   occurred before SEHI acquired Plaintiff, it could have made that clear in the Policy language

16   by way of an exclusion.  Its failure to do so is construed in favor of Plaintiff.  See e.g., Kilroy

17   Industries, 608 F.Supp. at 853 (finding that if the insurer had intended to include an exclusion,

18   it could have done so); Pacific-Southern Mortgage Trust Co. v. Insurance Co. of North

19   America, 166 Cal.App.3d 703, 711 (1985) ("[i]f [the insurer] had wanted the notice and the

20   limitations period to start upon the discovery of the fraud, it could have so stated").

21   On this issue, Defendant relies on three cases:  Hoffman v. State Farm Fire & Cas. Co.,

22   16 Cal.App.4th 184, 191 (1993); Fidelity Sav. and Loan Ass n. v. Republic Ins. Co., 513 F.2d

23   954 (9th Cir. 1975); and Vons Companies v. Federal Ins. Co., 212 F.3d 489 (9th Cir. 2000).

24   Each of those cases is inapposite.  For instance, Hoffman held that a former homeowner could

25   not recover losses under an insurance policy for damage that manifested after the homeowner

26   sold the property and after the insurance policy had expired.  Defendant asserts that Hoffman

27   requires a finding that SEHI did not have an insurable interest in the property stolen by

28   employees prior to October 2, 2005, just as the former homeowner did not have an insurable

interest in the property after its sale, which also caused the expiration of the policy.  Defendant overlooks the fact that Plaintiff, a named insured, owned the gold at the time it was stolen, and discovered the loss during the Policy period.  See Knowles Decl. ¶ 19.  Therefore, Plaintiff had an insurable interest in the stolen gold throughout the claim period. Thus, Hoffman does not support Defendant's position.

In Fidelity Savings, Republic Insurance Company ("Republic") issued a fidelity bond to Fidelity Savings ("Fidelity") for the period 1962 to 1968.  The bond covered "losses sustained by the Insured at any time but discovered during the bond period." 513 F.2d at 956.  The bond also covered litigation costs incurred in defending suits brought as the result of employee dishonesty.  Id. at 955.  Fidelity Savings merged with Trans-Bay in 1966, four years after the bond had first been issued.  Fidelity succeeded to all of the assets and liabilities of Trans-Bay as a result of the merger, including losses suffered by Trans-Bay prior to the merger arising from alleged employee fraud.  After the merger, Fidelity incurred litigation costs resulting from the Tran-Bay s pre-merger employee fraud.  After resolving the matters, Fidelity sued on bonds issued to both Fidelity and Trans-Bay, seeking to recover the litigation costs.  The district court granted summary judgment in favor of Republic, holding that any loss was sustained by Trans-Bay, not by Fidelity.  The Ninth Circuit affirmed, holding that the losses occurred before the merger, and therefore were sustained Trans-Bay, not Fidelity.  Id. at 956.  The Ninth Circuit rejected the argument that Fidelity sustained a loss by virtue of the succession of liabilities caused by the merger.  Id.  Thus, the bond issued to Fidelity would not provide coverage.  Id.

Fidelity Savings is distinguishable on two grounds.  First, as explained above, Plaintiff was a named insured under the Policy and, thus, was the insured entity that suffered the losses.  Second, the insured in Fidelity Savings acquired the entity suffering losses several years after the policy had been issued, and the insured was aware of the losses at the time of the acquisition.  Id. at 956.  Extending coverage in that case would have held Republic liable for losses of an entity that was not part of the insured at the time the policy was issued.  It would also have extended coverage for a loss that the insured was aware of before it acquired the other company.  In contrast, here, SEHI acquired Plaintiff years before the losses were

1  discovered, and before Defendant issued the Policy.  Extending coverage to Plaintiff's losses

2  would not expand Defendant's coverage to losses suffered by an entity it did not insure.

3      Finally, Vons is also inapposite.  In Vons, an employee of Vons was alleged to have

4  defrauded third-party victims.  The victims sued Vons and others.  Vons eventually settled the

5  litigation for $10 million, the limit of its fidelity insurance policy with Federal Insurance

6  Company ("Federal").  The Ninth Circuit, in upholding summary judgment in favor of Federal,

7  concluded that "Federal provided Vons with coverage for 'direct losses' that were 'caused by'

8  employee theft or forgery.  Vons's policy did not provide coverage for third party claims. …

9  We hold that 'direct' means 'direct' and that in the absence of a third party claims clause,

10  Vons's policy did not provide indemnity for vicarious liability for tortious acts of its

11  employee."  212 F.3d at 492-493.  Defendant argues that Vons stands for the proposition that

12  the loss sustained by Plaintiff as a subsidiary of SEHI only occurred when it was acquired by

13  SEHI and, thus, any pre-acquisition loss is not a "direct" loss to the insured.  The argument is

14  without merit.  Here, the insured is defined by the Joint Insured endorsement, and it is

15  undisputed the definition includes Plaintiff, which was a subsidiary of SEHI when the Policy

16  was issued and throughout the Policy period.  Put simply, Plaintiff was not a "third party" to

17  the Policy, as was the case in Vons.

18      For these reasons, Defendant's motion for partial summary judgment is DENIED.

19  **IV.    ANALYSIS - PLAINTIFF'S MOTION**

20      Plaintiff moves for partial summary judgment with respect to Defendant's Sixth,

21  Seventh, Ninth, and Tenth Affirmative Defenses on the grounds that the scope of the Policy's

22  coverage is established as a matter of law, and there are no material facts in dispute as to these

23  defenses.

24      **A.    DEFENDANT'S SIXTH AFFIRMATIVE DEFENSE**

25      The Sixth Affirmative Defense alleges that Plaintiff failed to give Defendant timely

26  notice of discovery of the loss, and that Defendant was prejudiced by the delay.  In particular,

27  Endorsement No. 5 of the Policy states that "after any member of the … human resource

28  department discovers a loss or a situation that may result in loss from damage to [] covered

1  property … the human resource department must … notify us as soon as possible."  SUF Ex.

2  A, Endorsement No. 5.  Defendant argues that since Plaintiff's human resources department

3  knew of the loss in early January 2008, when Plaintiff's employees were terminated, Plaintiff's

4  failure to give Defendant notice of the loss until May 23, 2008 resulted in prejudice.

5  Specifically, the Proof of Loss submitted by Plaintiff indicates that between January of 2008

6  and May of 2008, Plaintiff sustained losses ranging from $175,834.73 to $512,500.96.

7  Valeriano Decl. Ex. 4 at 54.  According to Defendant, it has been prejudiced in the amount of

8  $175,834.73 to $512,500.96 because it was "only notified of the loss in May of 2008, after the

9  thefts had abated," and had it been given prompt notice, it could have "at least put itself on

10  record as to the methodology required to put an immediate end to the thefts in question."

11  Def.'s Opp. at 7-8.  Defendant further asserts that it was precluded from the "opportunity to

12  work with [Plaintiff] to ensure that five further months of losses were avoided."  Id. at 9.

13          In order to demonstrate the requisite prejudice, Defendant must show that, due to delay

14  in reporting the loss, Defendant "lost something that would have changed the handling of the

15  underlying claim[.]"  Jones v. St. Paul Travelers, 496 F.Supp.2d 1079, 1085 (N.D. Cal. 2007).

16  An insurer must show that, but for the delay, there is a substantial likelihood that the insurer

17  would have been able to garner a better result.  See Northwestern Title Security Co. v. Flack, 6

18  Cal. App. 3d 134, 143 (1970) (demonstrating possible prejudice does not satisfy the insurer's

19  burden; the insurer must show actual prejudice, which "does not arise merely because a

20  delayed or late notice has denied the insurance company the ability to contemporaneously

21  investigate the claim or interview witnesses").

22          As indicated, Defendant argues that it was prejudiced by losses that occurred between

23  January 2008, when the first employee was discovered stealing gold, and May 2008, when

24  notice was given.  However, Defendant has failed to proffer any evidence showing that the

25  delay denied it the ability to effectively investigate the claim or interview witnesses.  Nor has

26  Defendant submitted any evidence creating a triable issue of fact that the losses would have

27  been diminished if Plaintiff had reported the claim sooner.  Instead, the undisputed evidence

28  shows that Plaintiff immediately reported evidence of Kahue's suspected thefts to the police,

1   that soon thereafter the Concord Police department questioned Kahue, that Kahue admitted his

2   thefts, and Plaintiff terminated his employment.  It is also undisputed that the police and FBI

3   launched a multi-month investigation that resulted in the federal criminal prosecutions of

4   former employees.  Moreover, Defendant's lead investigator on Plaintiff's claim, Richard

5   Searcy, stated during his deposition that "under the terms of the policy, it appears [Plaintiff]

6   gave us prompt notice," and Defendant "wouldn't have stopped the theft . . . regardless of

7   when notice was given."  Hartmann Decl. Ex. 2, Searcy Dep. Tr. 27:22-28:2; 77:4-78:3.

8   Defendant has offered no evidence to the contrary.

9         Furthermore, Defendant's alternative argument – that Plaintiff  "allowed" thefts to

10   continue from January to May 2008, and, thus, the losses occurred during that time are

11   "voluntary payments" made to the thieving employees – is unpersuasive.  Again, Defendant

12   fails to submit any evidence that Plaintiff allowed thefts to continue.  Moreover, the legal

13   authorities Defendant relies on in support of this argument are distinguishable.  Specifically,

14   Faust v. The Travelers, 55 F.3d 471 (9th Cir. 1995), Jamestown Builders, Inc. v. General Star

15   Indem. Co., 77 Cal. App. 4th 341 (1999), and Gribaldo, Jacobs, Jones & Assoc. v. Agrippina

16   Versicherunges A.G., 3 Cal.3d 434, 446 (1970) each involved a third-party indemnity policy

17   containing a clause expressly exempting "voluntary" payments made before notice was given

18   to and consent received from the insurer.  The continuing thefts of gold that occurred by

19   Plaintiff's employees between January and May of 2008 are not analogous to "voluntary

20   payments," as the thefts were not voluntary.  Defendant's reliance on this line of reasoning is

21   therefore faulty.

22         At bottom, Defendant has failed to meet its burden in establishing that there is a genuine

23   factual issue for trial regarding its Sixth Affirmative Defense.  Therefore, Plaintiff's motion for

24   summary judgment as to Defendant's Sixth Affirmative Defense is GRANTED.

25         **B.    DEFENDANT'S SEVENTH AFFIRMATIVE DEFENSE**

26         Defendant's Seventh Affirmative Defense presents the same issue as Defendant's

27   instant motion for partial summary judgment, addressed above.  Specifically, with this defense,

28   Defendant seeks to preclude Plaintiff's claim for losses sustained before October 2, 2005, i.e.,

before Plaintiff became a subsidiary of SEHI.  In its opposition to Plaintiff's motion, Defendant has presented the same arguments as in its own affirmative motion.  As indicated above, the Court finds that the Policy language unambiguously covers Plaintiff's losses incurred prior to October 2, 2005.  Given that Defendant has offered no new arguments in it opposition, and has not identified any factual disputes with respect to this defense, the Court GRANTS Plaintiff's motion for partial summary judgment as to Defendant's Seventh Affirmative Defense.

### C.   DEFENDANT'S NINTH AFFIRMATIVE DEFENSE

Defendant's Ninth Affirmative Defense alleges that Endorsement No. 15 of the Policy may apply such that coverage was cancelled as to Plaintiff's employee, Coronado, before 2008, because his supervisors suspected him of stealing gold in 2003.  Endorsement No. 15 states that the Policy is cancelled as to any employee "if the insured possesses knowledge of any act or acts of fraud or dishonesty committed by such employee."  SUF Ex. A, Endorsement No. 15 (emphasis added).  Plaintiff argues that summary judgment is appropriate as to this defense because the undisputed facts show that Plaintiff did not possess knowledge of Coronado's theft prior to 2008.

In response, Defendant argues that material issues of fact preclude summary judgment as to this defense.  The Court agrees.  While Coronado's supervisors, Gladding and Almazan, testified that they were unable to conclusively determine whether Coronado was stealing gold based on the log discrepancies, the evidence presented could lead a jury to reasonably conclude that Plaintiff nevertheless possessed knowledge of the theft to preclude coverage.  Moreover, Defendant has presented evidence that varies from Plaintiff's version of events, in that this evidence indicates that it was expressly reported to Gladding by one of Coronado's co-workers, Rudy Artarp, that Coronado was taking gold from Plaintiff's facility.  See Valeriano Decl. Ex. 2, Almazan Dep. Tr. 129:1-130-21.  Moreover, Almazan testified that Gladding told him that she believed that Coronado was taking gold.  Id. 131:6-17.  Almazan also testified that he and Gladding discussed the Coronado situation with Quezada, Plaintiff's human resources manager, for advice on how to handle the situation.  Id. 175:20-176:18.  Taken together, these facts could support the conclusion that Plaintiff possessed knowledge before 2008 sufficient to

1    terminate coverage for Coronado, regardless of whether Plaintiff ultimately took disciplinary or

2    legal action against him.  See Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d

3    1110, 1140-1141 (9th Cir. 2003) ("Credibility determinations, the weighing of the evidence,

4    and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,

5    whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence

6    of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

7    (internal citation omitted).

8        Therefore, Plaintiff's motion for summary judgment as to Defendant's Ninth

9    Affirmative Defense is DENIED.

10       **D.    DEFENDANT'S TENTH AFFIRMATIVE DEFENSE**

11       Defendant's Tenth Affirmative Defense asserts that Plaintiff failed to comply with

12   Condition 17, which limits coverage to property "own[ed] or [held]" by the insured, or for

13   which the insured is "legally liable."  SUF, Ex. A at 15, 16.  Simply put, Defendant's Tenth

14   Affirmative Defense is that Plaintiff did not own the gold that was stolen.

15       Plaintiff has submitted the declaration of Stuart Knowles establishing that it owned all

16   of the gold at the time it was stolen.  See Knowles Decl. ¶ 19.  Defendant concedes that it "does

17   not dispute that [Plaintiff] owned the gold in question."  Def.'s Opp. at 21.  Even so, Defendant

18   argues that Plaintiff did not own the gold stolen prior to October 2, 2005 – for the purposes of

19   the Policy – because SEHI had not yet acquired Plaintiff's corporate parent.  Defendant

20   presents that same argument in support of its Tenth Affirmative Defense as it made in support

21   of its own summary judgment motion; specifically, Defendant argues that the Policy only

22   covers losses of property after SEHI acquired Plaintiff.  For the reasons indicated above with

23   respect to Defendant's motion, the Court rejects that argument.  Accordingly, the Court

24   GRANTS Plaintiff's motion for partial summary judgment as to Defendant's Tenth

25   Affirmative Defense.

26       ///

27       ///

28       ///

1    **V.**     <u>**CONCLUSION**</u>

2         For the above stated reasons,

3         IT IS HEREBY ORDERED THAT:

4         1.      Defendant's Motion for Summary Adjudication (Dkt. 62) is DENIED.

5         2.      Plaintiff's Motion for Summary Adjudication (Dkt. 65) as to Defendant's Fifth,

6    Sixth, Seventh, and Tenth Affirmative Defenses is GRANTED.

7         3.      Plaintiff's Motion for Summary Adjudication (Dkt. 65) as to Defendant's Ninth

8    Affirmative Defense is DENIED.

9         4.      This Order terminates Dockets 62 and 65.

10        IT IS SO ORDERED.

11   Dated: 3/4/11                          _____
                                            SAUNDRA BROWN ARMSTRONG
12                                          United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28